COMMONWEALTH *vs.* JUAN COLLAZO (and four companion
cases[1]).

No. 92-P-94.

Suffolk. October 14, 1992. - February 3, 1993.

Present: DREBEN, KASS, & GREENBERG, JJ.

*Search and Seizure*, Probable cause, Exigent circumstances. *Probable
Cause. Constitutional Law*, Search and seizure, Probable cause. *Prac-
tice, Criminal*, Severance, Instructions to jury, Disclosure of evidence.

In a criminal case, the evidence presented at a hearing on the defendants'
motion to suppress a quantity of cocaine seized after a warrantless
search of an apartment established that there was not only probable
cause for police to search the apartment but also exigent circumstances
that justified the warrantless search and the seizure of the cocaine. [83-
84]

At the joint trial of three defendants charged with trafficking in over two
hundred grams of cocaine on September 26, 1990, and of a fourth de-
fendant charged with the same crime and with trafficking in an addi-
tional amount of over fourteen grams of cocaine on September 21,
1990, the judge properly denied a motion by one of the three defend-
ants to sever his trial from that of the fourth defendant, where joinder
of the offenses was appropriate and nonprejudicial because of the prox-
imity in time and the similarity of the offenses, and where the judge
carefully limited the admission of the fourth defendant's pre-September
26 statements to his case only. [85]

A motion by a criminal defendant for a mistrial based on the alleged im-
proper failure of the Commonwealth to produce certain letters written
by a codefendant after his arrest and certain notes that a police officer
used to prepare his report was properly denied where, with respect to
the letters, the judge appropriately relied on curative instructions as an
adequate means to correct any error and to remedy any prejudice to the
defendant and where, with respect to the police officer's notes, the judge
was warranted in concluding that no prejudice resulted. [86]

---

[1]Two of the companion cases are against Fernandez Santiago. The
remaining two are against Aquiles Encarnacion and Hermensjildo Estrella.
While Santiago was convicted of the charges on both indictments (the
second one alleged trafficking in an additional amount of over fourteen
grams of cocaine on September 21, 1990), none of the arguments on
appeal relate to the conviction for the earlier offense.

INDICTMENTS found and returned in the Superior Court Department on October 4, 1990.

Motions to suppress evidence were heard by *John J. Irwin, Jr.,* J., and the cases were tried before him.

*Roger A. Cox* for Fernandez Santiago.

*John J. Barter* for Juan Collazo.

*Nancy W. Geary,* Assistant Attorney General, for the Commonwealth.

*Robert E. Kenney,* for Hermensjildo Estrella, & *John J. Russell,* for Aquiles Encarnacion, were present but did not argue.

GREENBERG, J. Four defendants were convicted on one count of trafficking in over two hundred grams of cocaine. G. L. c. 94C, § 32E(4). Their appeals focus on three common and discrete issues: (1) whether the police improperly conducted a warrantless search of Santiago's apartment; (2) whether the judge improperly failed to sever the cases pursuant to Mass.R.Crim.P. 9(d), 378 Mass. 860 (1979); and (3) whether the Commonwealth's failure to produce certain written statements and police reports prior to trial requires reversal. We affirm each of the convictions.

We take our facts from the detailed findings of the motion judge (who was also the trial judge), supplemented by additional undisputed testimony submitted at the hearing. The jury could have found the same facts from the evidence presented at the trial.

On September 26, 1990, an undercover State police officer, Dennis Brooks, assigned to the Attorney General's narcotics division, received a message on his beeper to call the defendant Santiago at his apartment in East Boston. During the course of the returned call, Santiago told Brooks that his suppliers had been in his apartment at 8:00 A.M., and they had left some cocaine for Brooks to test. Between 10:30 A.M. and 11:00 A.M., Brooks went to a vacant lot located some six buildings away from Santiago's apartment where five days earlier he had purchased twenty-eight grams of cocaine from Santiago (see note 1, *supra*). There, he again met Santiago, who took a bottle cap full of cocaine from one of the

automobiles in the lot for Brooks to sample. It was agreed that he would contact Santiago in half an hour if the sample was to his liking. Forty-five minutes later, Santiago paged Brooks, who was stuck in traffic on his way back to Boston. Brooks then telephoned Santiago, and a deal was tentatively set to buy three-eighths of a kilo of cocaine for $12,800. Next, Brooks notified Sergeant Quigley, his supervisor, but was redirected by him to Revere, to assist in an unrelated surveillance. Around 12:30 P.M., Brooks — still in Revere — was paged a second time by Santiago, who told him that the amount of cocaine had been decreased by an eighth of a kilo. At this point, Brooks thought that the deal was "a go." He proceeded to the Attorney General's office, arriving there at 1:00 P.M., where he procured a flash roll for the amount of the original order and called for more surveillance officers. He returned to Revere between 1:45 P.M. and 1:50 P.M. to assist fellow officers in making an unrelated arrest, which occurred minutes later. Brooks and other undercover troopers then rode to the Liberty Day Market in East Boston and established several alternate arrest plans dependent on where the purchase from Santiago would take place. At 2:30 P.M., Brooks, who was wired with a monitor for his safety,[2] went into Santiago's second-floor apartment. Santiago made some phone calls, told Brooks that his connections would be coming from Lynn in half an hour, and informed Brooks that he

---

[2]Collazo asserts, as an alternative argument, that the judge should have suppressed all observations of Officer Brooks, all conversations, and all physical evidence resulting from the search of the apartment because Brooks failed, as required by G. L. c. 272, § 99, to obtain a warrant authorizing this type of interception. In essence, Collazo argues that the remedy for unlawful interception may extend beyond merely suppressing the transmissions as overheard by a third party. The judge found that the officers needed a warrant and, applying *Commonwealth* v. *Blood*, 400 Mass. 61 (1987), limited the defendant's sweeping request to allow only the exclusion of testimony of the officers who overheard the untaped conversations between Brooks and the defendants. There was no error; Brooks's observations and conversations did not have to be suppressed. See *Commonwealth* v. *Jarabek*, 384 Mass. 293, 299 (1981) (the exclusionary rule would not extend to live testimony of a participant in an unlawfully recorded conversation), and cases cited.

wanted the deal to occur in his apartment but that it was not a matter within his control.

After forty-five minutes passed, Santiago and Brooks walked outside to the vacant lot. Eventually, the defendant Collazo approached them, Collazo and Santiago spoke in Spanish, and then all three started back to Santiago's apartment. As they were walking toward the apartment, two others, the defendants Encarnacion and Estrella, trailed them in a parallel course from across the street and joined them at the apartment building's entrance. Collazo conversed with them in Spanish. The two waited outside and posted guard, while Collazo, Santiago, and Brooks went into the apartment. As Brooks and Collazo were discussing the logistics of the deal, Encarnacion and Estrella walked into the apartment through the open front door, and they each pulled out from their pants plastic bags filled with cocaine, placing them on the kitchen table.[3] Encarnacion and Estrella left on Collazo's instruction. Twice, Brooks tried in vain to lure Collazo outside (to his automobile) to complete the deal. After Collazo refused, Brooks went outside to his automobile to get the money. As he approached the trunk of his vehicle, Santiago's wife warned Brooks the cops were coming and that he should leave. Fearful of exposure, Brooks left in his vehicle. Encarnacion and Estrella were still standing in front of the building; when they noticed the other undercover officers, they started to run but were apprehended after a short footchase. Sergeant Quigley and three other officers went into Santiago's apartment. When they passed into the hallway to the second floor, Quigley announced, "State Police." The front door to the apartment was still open as the troopers walked in, with Quigley in the lead displaying his badge.[4] Collazo and Santiago were seated at the kitchen table, with the cocaine still on top. They were arrested, the drugs seized, and a security check of the apartment was made.

---

[3]At trial it was established that one of the bags contained 123.5 grams of seventy percent pure cocaine and the other contained 123.8 grams of thirty percent pure cocaine.

[4]The entrance of the police officers was peaceable and during the day.

The defendants make a two-part argument against the judge's determination that the officers' search of the apartment was reasonable: first, that the officers lacked probable cause to conduct a warrantless search; second, regardless of the existence of probable cause, the Commonwealth has not sustained its burden of demonstrating the exigent circumstances necessary to justify the warrantless search of the apartment and the seizure of the cocaine. Neither argument withstands analysis.

The record reflects, and the judge's findings specifically tell us, that probable cause to search Santiago's apartment did not arise until Brooks saw Encarnacion and Estrella remove the bags of cocaine from their pants.[5] See *Commonwealth* v. *Cast*, 407 Mass. 891, 903-906 (1990). Prior to that moment, it remained uncertain whether and where the transaction would take place.[6] The defendants, relying on *Commonwealth* v. *Hall*, 366 Mass. 790, 800-801 (1975), suggest that the government has failed to demonstrate probable cause. In that case the search of a third-floor apartment was held invalid because the officers were operating under a warrant authorizing a search of an apartment on the second floor. The court held that exigent circumstances did not exist to justify a warrantless search of the unit above, in which no people were present, a circumstance absent in the instant case.

We have frequently stated the familiar rule that "warrantless entries are per se unreasonable unless they fall within one of the few narrowly drawn exceptions to the Fourth

---

[5]The judge also found that, even assuming Brooks had probable cause, he had no time to obtain a search warrant. He noted that, in the approximately two-hour period between his last conversation with Santiago and his arrival at Santiago's apartment, Brooks had to drive back from Revere to the Attorney General's office, obtain a flash roll, assemble a surveillance team when the department was shorthanded, return to Revere to assist in a surveillance and arrest, go back to East Boston, and establish a series of plans for this investigation. Compare *Commonwealth* v. *Minh Ngo*, 14 Mass. App. Ct. 339, 341-342 (1982). Contrast *Commonwealth* v. *Wigfall*, 32 Mass. App. Ct. 582, 587 (1992) (police officers had three hours to obtain an arrest warrant and provided no justifiable excuse for the delay).

[6]The police officers were not obligated to obtain an anticipatory search warrant. See *Commonwealth* v. *Cast*, 407 Mass. at 906.

Amendment warrant requirements." *Commonwealth* v. *Amaral*, 16 Mass. App. Ct. 230, 233 (1983). Probable cause must be coupled with exigent circumstances to justify a police intrusion into the home. *Commonwealth* v. *Forde*, 367 Mass. 798, 800 (1975). The question whether exigent circumstances exist depends upon an evaluation of all the circumstances as they appear to the police at the time. See *Commonwealth* v. *Hall*, 366 Mass. at 802; *Commonwealth* v. *Huffman*, 385 Mass. 122, 125 (1982). Here, after Brooks saw the cocaine, and thus had probable cause to search the apartment, it was impracticable to secure a warrant. See *Commonwealth* v. *Olivares*, 30 Mass. App. Ct. 596, 599 (1991). See also *Commonwealth* v. *DiSanto*, 8 Mass. App. Ct. 694, 700 (1979). As in the *Olivares* case, the officers had no information which tied Santiago's residence to the illegal drug transactions. Prior to this arrest, Brooks had never seen or heard of any evidence of contraband in Santiago's apartment; their previous cocaine exchanges were conducted in the vacant lot, not inside the apartment. In point of fact, no one knew where the transaction would take place until the drugs were actually produced. In denying the motion to suppress, the judge found that "Brooks anticipated making the buy outside or having to go to Lynn or Dorchester for it." Such an unpredictable circumstance became the essence of an exigency which permitted the officers to dispense with "taking the time to obtain a warrant because to do so would thwart . . . the arrest." *Commonwealth* v. *Huffman*, 385 Mass. at 126, quoting from Latzer, Police Entries to Arrest — *Payton* v. *New York*, 17 Crim. L.B. 156, 163 (1981). Contrast *Commonwealth* v. *Wigfall*, 32 Mass. App. Ct. 582, 587 (1992) (where judge found that "no place other than [the basement apartment] was ever mentioned" as a location where the deal would occur, and it was foreseeable to the police that they would have to enter the apartment to either arrest or search).[7]

---

[7]The defendants assert on appeal that, as in the *Wigfall* case, the police officers had probable cause to arrest Santiago and thus should have obtained an arrest warrant before entering the apartment. In *Wigfall*, the

That Santiago was also indicted on a separate charge for the events that occurred on September 21 (see note 1, *supra*) prompted Estrella's trial counsel to request that the earlier incident be the subject of a separate trial. The basis for the motion was that the statements and acts of Santiago prior to September 26 were so prejudicial to the other defendants as to require severance.[8] The judge's denial of the motion was proper. The defenses were not mutually antagonistic, although "codefendants do not become entitled to severance 'because of the possibility that they might wish to assert antagonistic defenses or use different trial strategy.'" *Commonwealth* v. *Moran*, 387 Mass. 644, 658-659 (1982) (severance required where the only realistic escape is for the defendants to blame each other). Rather, joinder of the offenses was appropriate and nonprejudicial because of the proximity in time and the similarity of the offenses, and the judge carefully limited the admission of Santiago's statements made prior to September 26, 1990, to his case only. *Commonwealth* v. *Weaver*, 400 Mass. 612, 618 (1987). See also *Katz* v. *United States*, 321 F.2d 7, 11 (1st Cir.), cert. denied, 375 U.S. 903 (1963) (the fact that all the evidence is not admissible against all defendants does not necessitate separate trials).

---

officers had probable cause to arrest the defendant for the specific transaction for which the search was conducted. 32 Mass. App. Ct. at 584. Here, in contrast, there was no probable cause to arrest Santiago for trafficking in the 200-plus grams involved in the September 26 transaction until the cocaine was placed on the kitchen table. While the police had probable cause to arrest Santiago for the earlier September 21 transaction involving twenty-eight grams of cocaine (see note 1, supra), as we noted previously, there was every indication that the transaction was *not* going to take place in Santiago's apartment. Contrast *Wigfall, supra* at 587 ("the judge made a specific finding that it was reasonably foreseeable at 1:00 P.M. that the police would have to enter Wigfall's apartment either to arrest him or to search it for drugs").

[8]On appeal, Collazo and Encarnacion join in the argument. Below, their focus was on separate trials for each defendant (a position that has been practically abandoned on appeal). In any event, our conclusion that Estrella's motion to sever was properly denied obviates any need to reach the issue whether this issue was preserved for them and whether their counsel was ineffective in not joining in Estrella's motion.

The judge properly denied Encarnacion's motion for a mistrial based on the prosecutor's failure to provide (1) letters written by Collazo to the police after his arrest and (2) certain notes that Brooks used to prepare his police report. The judge excluded the contents of Collazo's letters and limited the use thereof to cross-examination (to demonstrate that Collazo spoke English). "Here, the judge correctly relied on curative instructions as an adequate means to correct any error and to remedy any prejudice to the defendant." *Commonwealth* v. *Amirault*, 404 Mass. 221, 232 (1989). We also affirm the judge's finding that no prejudice resulted from the absence of the notes that Brooks had used to write his police report and had then destroyed. There was no indication that the notes would have supplied favorable information. Cf. *Commonwealth* v. *Buckley*, 410 Mass. 209, 218-219 (1991). Further, as indicated, Brooks had used the notes in writing his police statement, and the statement was made available to all defendants.

Encarnacion and Collazo also argue that, while no single issue standing alone might require reversal, in combination, the result was a fundamentally unfair trial. Our review of the record and our conclusion that none of the issues raised amounts to error assures us that this contention is without merit. Compare *Commonwealth* v. *Colantonio*, 31 Mass. App. Ct. 299, 314 (1991). Contrast *Commonwealth* v. *Cancel*, 394 Mass. 567, 576 (1985).

*Judgments affirmed.*