Whitehead, J.
Introduction
The defendant has been indicted on charges of distributing a Class B controlled substance (second offense) and distributing a Class B controlled substance in a school zone. He has moved to suppress evidence seized by members of the Lynn Police Department after a warrantless entry into his home on November 28,1995. The Court heard evidence on the motion on June 4, 1996. The following constitute the Court’s findings of fact, rulings of law and order on the motion.
Findings of Fact
On November 28, 1995, Officer Paul Holey worked a 5:00 p.m. — 1:00 a.m. shift as a plain clothes member of the Lynn Police Department’s “STEP” Unit. The STEP Unit is a unit which specializes in drug enforcement. At the time that he commenced his shift, Officer Holey was familiar with the premises located at 14 Holland Avenue, in Lynn. He knew them to consist of a three-story six-unit apartment building. Two units were located on each floor, one on the left and one on the right. Officer Holey had been inside of the building on “many occasions” in the recent past and was aware that, at one time or another, every apartment in the building had served as a location for narcotics dealing. In fact, on two separate occasions in the two weeks preceding November 28, 1995, he personally had participated in the arrest of individuals who were dealing in narcotics out of the second-floor right apartment. Each arrest had occurred at the apartment and had involved a different individual. On each occasion, the arrestee had been alone in the apartment. On the second occasion, at least, the arrest had followed a hand-to-hand purchase by an undercover officer.
At roll call on November 28, 1995, Officer Charles Griffin, who was assigned to regular uniformed patrol, informed Officer Holey that the premises at 14 Holland Street were “back on,” meaning that narcotics dealing was once again occurring at the building. In fact, Officer Griffin stated that five of the six apartments were now involved in such activity. The source of Officer Griffin’s information at that time is unclear to the Court.
At some point during the shift, Officer Griffin and his partner, Officer Sean Hogan, conducted a surveillance of the building and observed heavy pedestrian traffic consistent with narcotics dealing. The officers also spoke with neighbors and with a tenant of the one apartment which was not involved in narcotics dealing. Those sources confirmed that both of the second-floor and third-floor apartments, in particular, were actively involved in narcotics dealing at that time. The officers had no information as to the identity of those who were dealing.
Officers Griffin and Hogan met up with Officer Holey later during the shift and updated him on what they had learned. As a result of that meeting, the three officers decided to attempt an undercover purchase from the second-floor right apartment. Accompanied by two more officers, Joseph Tansey and Michael Kelter, they proceeded to 14 Holland Avenue. Upon their arrival, Officers Holey and Tansey entered the building through the unlocked front entrance. (During Officer Holey’s many *481 previous visits to the building, he had never found the door to be locked.) They then proceeded up a common stairway to the second floor-landing. As noted earlier, Officer Holey was in plain clothes. However, he was wearing a badge on a chain around his neck. Officer Kelter was in plain clothes with no badge visible. Officer Tansey entered the building and proceeded up a rear staircase to a rear second-floor landing. The other two officers remained outside of the building.
Once on the second floor, Officer Holey positioned himself to the left of the door which enters into the second-floor right apartment. Posing as a purchaser of drugs, Officer Kelter stood directly in front of the door. Officer Kelter then knocked on the door. The officers heard what sounded like an Hispanic male respond verbally to the knock. The door then opened approximately six inches. Officer Kelter asked for a “twenty” (a twenty-dollar bag of cocaine) and handed a marked twenty-dollar bill to the party who had answered the door. The door closed for a moment and then re-opened. The man inside handed Officer Kelter what appeared to be a bag of crack cocaine. With the door still ajar, the officers identified themselves as police officers, pushed it open and entered the apartment. The man behind the door was the defendant. The officers immediately placed him under arrest for distribution of cocaine. Officer Kelter conducted a pat frisk of his person and recovered $141, including the marked bill.
At the time that they entered the apartment, the officers were unaware as to how many occupants were inside. For that reason, and in order to ensure the safety of both officers, Officer Holey undertook a “protective sweep” of the apartment. To that end, he walked through each of the rooms and the halls and looked to see if anyone else was present. During the walk-through, he observed on the kitchen counter a plastic bag which, in turn, contained plastic “twists” of what appeared to the officer to be crack cocaine. Officer Holey seized the bag and its contents.
Although there was a rear door to the apartment, it was barricaded shut from the inside. However, from his previous experience with the building, Officer Holey knew that two windows of the apartment overlooked an “air shaft.” The “air shaft” consisted of a narrow rectangular courtyard which was completely enclosed by the building and which ran from ground level to the sky. On at least one prior occasion when he had been in the second-floor right apartment, Officer Holey had observed 2x4 planks running from a window of that apartment to a window of the apartment directly across the air shaft. The apparent purpose of the planks had been to provide the occupants with a means of escape.
Accordingly, after walking through the apartment, Officer Holey decided to extend his protective sweep to a view out of the windows and into the courtyard. His concern was that one or more occupants of the apartment might be lurking in the area of the air shaft. As he proceeded toward the window, he noticed in plain view, on the sill, currency in the amount of $139. Believing the money to be the proceeds of narcotics transactions, he seized it. Officer Holey then returned to the front room, and he and Officer Kelter removed the defendant from the apartment.
The defendant now seeks to suppress the fruits of the entry into, and search of, his apartment. These include the cocaine which was seized from the kitchen counter, the sums of money which were seized from the defendant’s person and from the window sill, and, presumably, observations as to the identity of the defendant.
Rulings of Law
The defendant challenges the validity of the officers’ actions on the ground that: (1) the warrantless entry into the apartment was not justified by exigent circumstances: and (2) Officer Holey’s further intrusion into the apartment for the purpose of conducting a “protective sweep” was also unlawful.[1] The Court deals with each issue separately.
I. The Initial Entry
“[W]arrantless entries are per se unreasonable unless they fall within one of the few narrowly drawn exceptions to the Fourth Amendment warrant requirements. Commonwealth v. Amaral, 16 Mass.App.Ct. 230, 233 (1983). Probable cause must be coupled with exigent circumstances to justify a police intrusion into the home. Commonwealth v. Forde, 367 Mass. 798, 800 (1975).The question whether exigent circumstances exist depends upon an evaluation of all the circumstances as they appear to the police at the time. See Commonwealth v. Hall, 366 Mass. At 802; Commonwealth v. Huffman, 385 Mass. 112, 125 (1982).” Commonwealth v. Collazo, 34 Mass.App.Ct. 79, 84 (1993). “Factors which would . . . [tend] to support a finding of exigency include a showing that the crime was one of violence or that the suspect was armed, a clear demonstration of probable cause, strong reason to believe that the suspect was in the dwelling, and a likelihood that the suspect would escape if not apprehended. Additional considerations testing the reasonableness of police conduct are whether the entry is forcible and whether the entry is in the nighttime.” Commonwealth v. Forde, supra at 807 (citation omitted). The list, of course, is not exhaustive.
In the present case, the officers, having witnessed the drug transaction itself, possessed ample probable cause to believe that the defendant had committed a felony. They knew that the defendant remained inside of the apartment. They did not know how many other individuals, if any, were also inside of the apartment. In order to ensure that the defendant not flee while they sought a warrant for his arrest, they would have had to post a sentry immediately outside of his apartment. Posting a sentry anywhere else would permit the possibility that the defendant would pass across the second-floor landing from the right-side apartment to the left-side apartment. Moreover, even a sentry posted immediately outside of the right-side door *482 would not have prevented the possibility that the defendant might pass undetected across the rear air shaft to other apartments, a possibility which Officer Holey knew from prior experience to be a real one. Even if one disregarded that possibility, the posting of a sentry immediately outside of the door would have given rise to the alternate possibility that someone other than the defendant might emerge from the apartment, observe the sentry, and alert the defendant to the police presence. Still alternatively, a would-be purchaser of drugs might enter the building, come upon the sentry and do the same thing. If officers on the street interrupted traffic to the building in order to prevent such a scenario, the defendant or others in the building might wonder why business had stopped, seek to investigate and themselves discover the police presence. In short, there was no scenario short of effecting a warrantless entry into the apartment, which could give the officers assurance that the defendant would not escape from the apartment or destroy evidence (consisting, at least, of the marked twenty-dollar bill). Thus, sufficient exigency existed to dispense with the warrant requirement and to permit the officers to use the relatively benign means of pushing open the ajar door of the apartment, and enter the interior.
The Court finds the facts of this case similar to those presented in Commonwealth v. Lopez, 38 Mass.App.Ct. 748 (1995). There an undercover officer, using marked money, made a purchase of narcotics inside of an apartment. As he departed, he gave a prearranged signal to other officers, who then entered the apartment, arrested the seller and recovered the marked money. The Appeals Court upheld the trial judge’s finding that exigent circumstances justified the warrantless entry. In doing so, the Court noted that no probable cause existed until the controlled buy was accomplished and stated, “Police in controlled-buy situations are not required to obtain anticipatory warrants.” Id. at 749 (citations omitted). As to the nature of the exigency, the Court noted concerns similar to those expressed by this Court in the present case: “[T]he apartment remained occupied by the defendant and others, any one of whom would have to be stopped and searched if he or she left the premises unless the police were to risk the loss of evidence: additional visitors could appear at any time; the defendant would have time to secrete the marked bills without leaving the apartment; and a surveillance close enough to avoid the risk of the marked bills being moved from one apartment to another within the building would invite detection, giving the defendant time to destroy evidence.” Id. at 750-60 (footnote omitted). Accordingly, this Court finds Lopez controlling of the instant case. See also Commonwealth v. Navarro, 39 Mass.App.Ct. 161, 163-65 (1995) (war-rantless entry permitted into apartment for purpose of saving evidence when police had arrested one occupant outside after an undercover buy, drugs were in apartment, and additional occupant remained inside who might destroy evidence); Commonwealth v. Lee, 32 Mass.App.Ct. 85 (1992) (warrantless entry permitted into basement of supermarket immediately after undercover buy with marked bills had occurred there).[2]
II The “Protective Sweep”
Once the police had lawfully entered the apartment and arrested the defendant, they were, of course, properly entitled to search his person incident to that arrest. Ker v. California, 374 U.S. 23 (1963). It was pursuant to such a search that they recovered currency, including the marked money. The seizure was lawful.
The police were also entitled to conduct a broader “protective sweep” of the premises in order to ensure their safety. Commonwealth v. Bowden, 379 Mass. 472, 478 (1980). See also Commonwealth v. Acosta, 416 Mass. 279, 283 (1993). While the officers did not have wholesale authority to search every nook and cranny of the apartment, it was appropriate for Officer Holey to look into those areas where a person might be hiding. That was the limit of what he did. While doing so, he discovered the cocaine and the sum of money on the window sill. Because those items were in “plain view” at the time and because their eviden-tiary significance was readily apparent, it was lawful for him to seize the items. Bowden, supra; Acosta, supra. See also Commonwealth v. Young, 382 Mass. 448, 458 (1981) (where, by virtue of exigency, police are lawfully in a location, they “could take into their possession material having apparent evidentiary connection to the criminal activity they were in the course of investigating”).
ORDER
For the reasons stated above, the motion to suppress is DENIED.

The lawfulness of the police presence on the landing at the outset of the transaction is not an issue. The landing was clearly a common area to which access could freely be had through the unlocked front entrance by tenants, their guests, and members of the general public. Moreover, it is evident from the fact that the defendant conducted business with the officers (albeit as potential drug purchasers) that he approved of their presence outside of his door. Thus, he clearly had no reasonable expectation of privacy in the landing. See generally Commonwealth v. Acosta, 416 Mass. 279, 282 (1993); Commonwealth v. Dinnall, 366 Mass. 165, 166-67 (1974).

This Court is aware that on facts similar to those which exist here, another judge of the Superior Court has ruled a warrantless entry impermissible. Commonwealth v. Pena (Essex Superior Court, Nos. 25216 through 25251 Crim.) (May 10, 1994). However, there the Court found that the police went to the subject premises with the specific purpose of creating an exigency that would permit them to enter the apartment without a warrant. To the extent that such a finding influenced the judge in Pena, the circumstances are different here. There is nothing in this case to support the conclusion that the officers had any purpose other than to determine whether or not drugs were being sold at the apartment and, if they were, to arrest the seller in whatever manner the circumstances warranted.